1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LANA VELENTE-HOOK,

                                           NO. CIV. S-04-645 LKK/GGH
11
              Plaintiff,
12
         v.
13                                               O R D E R
     EASTERN PLUMAS HEALTH
14   CARE,

15            Defendant.
     _____/
16

17        Plaintiff, Lana Velente-Hook, brings various state and federal

18   claims against her former employer, Eastern Plumas Health Care

19   (hereinafter "EPHC"), alleging that it unlawfully discriminated and

20   retaliated against her based on her disability.  Plaintiff's claims

21   are brought pursuant to the Americans with Disabilities Act

22   ("ADA"), 42 U.S.C. §§ 12101 et seq., the California Fair Employment

23   and Housing Act, Cal. Gov't Code §§ 12940 et seq.("FEHA"), and

24   California Health and Safety Code § 1278.5 ("Safety Code").  This

25   matter comes before the court on the defendant's motion for summary

26   judgment or, alternatively, partial summary adjudication.  I decide

                                      1

1 the motion based on the papers and pleadings filed herein and after
2 oral argument.

### I.

### BACKGROUND

Plaintiff began working for the defendant as a licensed, vocational nurse at EPHC in Portola, California, during July of 2000.  Plaintiff was diagnosed with breast cancer in March, 2003, and subsequently went on a four-month medical leave to undergo surgery, chemotherapy, and radiation treatment.  During a meeting in June 2003, EPHC notified plaintiff that she would need to return to work at the end of her leave, beginning July 1, 2003.  According to the plaintiff, she explained to her supervisor, Lorraine Noble, and the director of Human Resources, Cathy Conant, that she was medically unable to return to work and requested additional leave.  Conant responded that she had exhausted her leave and denied her request.

Plaintiff returned to work on a part-time schedule in July of 2003.  According to plaintiff, however, EPHC continuously refused to accommodate her medical condition and discriminated against her.  She complains that EPHC denied her leave several times, refused to provide her with part-time shifts and a transfer to a hospital closer to her home, and also harassed, threatened, and retaliated against her.

////
////
////

2

**II.**

**SUMMARY JUDGMENT STANDARDS UNDER FED. R. CIV. P. 56**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); See also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Secor Limited v. Cetus Corp., 51 F.3d 848, 853 (9th Cir. 1995).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of
> informing the district court of the basis
> for its motion, and identifying those
> portions of "the pleadings, depositions,
> answers to interrogatories, and admissions
> on file, together with the affidavits, if
> any," which it believes demonstrate the
> absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

3

1  should be granted, "so long as whatever is before the district
2  court demonstrates that the standard for entry of summary
3  judgment, as set forth in Rule 56(c), is satisfied."  Id. at
4  323.

5     If the moving party meets its initial responsibility, the
6  burden then shifts to the opposing party to establish that a
7  genuine issue as to any material fact actually does exist.
8  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
9  586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv.
10 Co., 391 U.S. 253, 288-89 (1968); Secor Limited, 51 F.3d at 853.

11    In attempting to establish the existence of this factual
12 dispute, the opposing party may not rely upon the denials of its
13 pleadings, but is required to tender evidence of specific facts
14 in the form of affidavits, and/or admissible discovery material,
15 in support of its contention that the dispute exists.  Fed. R.
16 Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also First
17 Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954
18 (9th Cir. 1998).  The opposing party must demonstrate that the
19 fact in contention is material, i.e., a fact that might affect
20 the outcome of the suit under the governing law, Anderson v.
21 Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local
22 No. 169, Assoc. of Western Pulp and Paper Workers, 971 F.2d 347,
23 355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific
24 Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and
25 that the dispute is genuine, i.e., the evidence is such that a
26 reasonable jury could return a verdict for the nonmoving party,

4

1  <u>Anderson</u>, 477 U.S. 248-49; <u>see also</u> <u>Cline v. Industrial</u>

2  <u>Maintenance Engineering & Contracting Co.</u>, 200 F.3d 1223, 1228

3  (9th Cir. 1999).

4      In the endeavor to establish the existence of a factual

5  dispute, the opposing party need not establish a material issue

6  of fact conclusively in its favor.  It is sufficient that "the

7  claimed factual dispute be shown to require a jury or judge to

8  resolve the parties' differing versions of the truth at trial."

9  <u>First Nat'l Bank</u>, 391 U.S. at 290; <u>See also</u> <u>T.W. Elec. Serv.</u>,

10  809 F.2d at 631.  Thus, the "purpose of summary judgment is to

11  'pierce the pleadings and to assess the proof in order to see

12  whether there is a genuine need for trial.'" <u>Matsushita</u>, 475

13  U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's

14  note on 1963 amendments); <u>see also</u> <u>International Union of</u>

15  <u>Bricklayers & Allied Craftsman Local Union No. 20 v. Martin</u>

16  <u>Jaska, Inc.</u>, 752 F.2d 1401, 1405 (9th Cir. 1985).

17      In resolving the summary judgment motion, the court

18  examines the pleadings, depositions, answers to interrogatories,

19  and admissions on file, together with the affidavits, if any.

20  Rule 56(c); <u>See also</u> <u>In re Citric Acid Litigation</u>, 191 F.3d

21  1090, 1093 (9th Cir. 1999).  The evidence of the opposing party

22  is to be believed, <u>see</u> <u>Anderson</u>, 477 U.S. at 255, and all

23  reasonable inferences that may be drawn from the facts placed

24  before the court must be drawn in favor of the opposing party,

25  <u>see</u> <u>Matsushita</u>, 475 U.S. at 587 (citing <u>United States v.</u>

26  <u>Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (<u>per</u> <u>curiam</u>)); <u>See also</u>

1  <u>Headwaters Forest Defense v. County of Humboldt</u>, 211 F.3d 1121,

2  1132 (9th Cir. 2000).  Nevertheless, inferences are not drawn

3  out of the air, and it is the opposing party's obligation to

4  produce a factual predicate from which the inference may be

5  drawn.  <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp.

6  1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th

7  Cir. 1987).

8       Finally, to demonstrate a genuine issue, the opposing party

9  "must do more than simply show that there is some metaphysical

10 doubt as to the material facts. . . . Where the record taken as

11 a whole could not lead a rational trier of fact to find for the

12 nonmoving party, there is no 'genuine issue for trial.'"

13 <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

**III.**

**FACTS[1]**

16      The defendant, EPHC, is a health services provider with

17 "campuses" in Portola and Loyalton.  Def.'s Statement of

18 Undisputed Facts ("Def's SUF") at ¶ 1.  Plaintiff began working

19 for the defendant as a licensed, vocational nurse at the Portola

20 campus during July of 2000 and remained there until December 21,

21 2004. <u>Id.</u>

**A.   EPHC'S LEAVE POLICIES**

23      EPHC provides a four-month medical leave of absence, during

24 which the employee's job classification and pay rate are held

25 ────────────────

26      [1]  The facts are undisputed, unless otherwise noted.

6

1  and the employee continues all insurance benefits. Id. at ¶ 5.

2  EPHC also provides a personal leave of absence, at the

3  discretion of the CEO, for up to four months with a continuation

4  of all insurance benefits. Id. at 6.  If an employee returns to

5  work within 12 months of separation, credit is given for prior

6  seniority, however, the employee is not guaranteed to return to

7  the same position or pay rate under this policy. Id. at 7.

8  **B.   PLAINTIFF'S MEDICAL LEAVE**

9      On March 1, 2003, plaintiff was diagnosed with breast

10  cancer and immediately took a four-month medical leave of

11  absence to undergo surgery, chemotherapy, and radiation

12  treatment. Def.'s SUF at ¶ 13.  Pursuant to EPHC's policy, her

13  medical leave guaranteed reinstatement to her job classification

14  and pay rate and continuation of insurance benefits. Id. at 14.

15  Her physician's note to defendant stated that she might be able

16  to return to work on July 1, 2003. Id. at 13.

17      In early June of 2003, plaintiff met with her supervisor,

18  Lorraine Noble, and Personnel Coordinator, Cathy Conant, to

19  discuss her anticipated return to work.  Def's SUF at ¶ 15.

20  During the meeting, plaintiff informed Conant and Noble that she

21  was incapable of returning to her nursing duties, Def's SUF at

22  ¶ 19, and requested an extension of her leave until she finished

23  chemotherapy. Id. at 16.  Conant however, does not recall this

24  request. Id. at 17.  Conant explained that EPHC's medical leave

25  policy allowed for only a four-month leave, id., and that the

26  plaintiff would have to return to work at the expiration of her

7

1  leave or be removed from the payroll. Id. at 18.  Noble, Conant

2  and plaintiff discussed the creation of a chart-auditing

3  position as a possible accommodation. Id. at 20.  Conant also

4  advised plaintiff that EPHC needed medical certification from

5  her physician regarding her ability to return to work and any

6  limitations. Id. at 22.  Noble assured plaintiff that she would

7  schedule plaintiff's shifts to best accommodate her reaction to

8  the ongoing chemotherapy treatments. Id. at 25.

9      Subsequent to the June 2003 meeting, plaintiff provided

10  EPHC with a notice from her physician, Dr. Reddy, dated June 12,

11  2003, stating that the plaintiff may return to full nursing duty

12  for two days a week, with 12-hour shifts beginning July 1st.

13  Id. at 23.  It also stated that she was able to resume her usual

14  hours sometime in September.  Id.  On July 1, 2003, the

15  plaintiff returned to work under this modified schedule. Id. at

16  26.

17      Once plaintiff returned to work, she informed Noble that

18  she was tired and was experiencing some problems with her feet.

19  Def.'s SUF at ¶ 28.  She requested that she be allowed to wear

20  open-toed shoes rather than the traditional, closed-toe nursing

21  shoes. Id.  Noble approved this request. Id. at 29.

22      On several occasions, plaintiff was too tired at the end of

23  her shift to complete the 30-mile drive home from work and had

24  to pull over to sleep.  Def's SUF at ¶ 31.  After concerned

25  colleagues informed Noble of the plaintiff's inability to

26  complete her drive home, id. at 32, Noble and Conant scheduled a

meeting with the plaintiff for August 8, 2003 to discuss issues
relating to her schedule and ability to work, <u>id.</u> at 34.

On August 6th, plaintiff went to Conant's office to "seek
counsel" about the scheduled meeting.  Def.'s SUF at ¶ 37.
Plaintiff told Conant that she would not be capable of working
an additional 12-hour shift in September. <u>Id.</u> at 38.  Maxine
Flora ("Flora"), Chief Nursing Officer, joined Conant and the
plaintiff, <u>id.</u> at 35, to explain the scheduling issues to the
plaintiff, <u>id.</u> at 40.  The plaintiff ended the August 6th
meeting by stating that she was going to seek legal advice.
Plaintiff called in sick for her next two shifts and did not
attend the August 8th meeting. <u>Id.</u> at 44.

On August 8th, Conant, Flora and Noble met and discussed
how to address the situation with the plaintiff and decided to
require the plaintiff to be evaluated for duty fitness. <u>Id.</u> at
45.  Later that day, plaintiff came to the hospital to provide
Conant with a letter stating that she was not capable of working
even part-time. <u>Id.</u> at 46.  The plaintiff then went to pick up
her paycheck from Flora. <u>Id.</u>  Conant was on Flora's speaker
phone during the exchange between Flora and plaintiff. <u>Id.</u> at
50.  Defendant claims, and plaintiff disputes, that plaintiff
was so agitated that Conant was concerned about the possibility
of the plaintiff becoming violent that she called security. <u>Id.</u>

Sometime between August 8, 2003 and August 21, 2003,
Charles Guenther, EPHC's CEO, received Dr. Reddy's letter which
plaintiff had delivered to Conant on August 8th. Def.'s SUF at

51.  Guenther responded to Dr. Reddy with a letter describing EPHC's attempts to accommodate the plaintiff. Id. at 52.  He advised Dr. Reddy that, given plaintiff's inability to work and that she had exhausted her medical leave, she would be "suspended" on the payroll system "until she is able to return." Id.  Guenther believed that offering the plaintiff a personal leave of absence was inappropriate because she had refused to participate in the August 8th meeting. Id. at 53.

On August 26, 2003, plaintiff's attorney contacted EPHC requesting that Guenther contact him to discuss reasonable accommodations. Def's SUF at 55.  By September 16, 2003, through the efforts of their attorneys to reopen the interactive process, the plaintiff and EPHC agreed that plaintiff would continue a personal leave of absence and retain her benefits through December 31, 2003. Id. at 57, 58.

On November 3, 2003, plaintiff wrote EPHC a letter in which she requested certain accommodations upon return from her personal leave of absence. Def's SUF at 59.  Plaintiff requested that EPHC provide her (1) a part-time position consisting of (2) two 12-hour shifts on Thursday and Friday, and (3) a transfer to the Loyalton facility. Id. at 60.  Plaintiff did not provide any medical documentation to support these accommodations. Id. at 61.

By letter dated November 25, 2003, Guenther agreed to accommodate plaintiff with a part-time position, but explained that, "for the time being," he could not guarantee the night

1   shift or make the transfer to Loyalton. Id. at 68-69.  Guenther

2   also advised the plaintiff that upon her return, it would be

3   necessary to discuss the incident that occurred on August 8th to

4   determine appropriate corrective action. Id. at 70.  Guenther

5   further requested that plaintiff provide medical documentation

6   relating to her return to work. Id. at 71. Guenther invited

7   plaintiff and her attorney to a meeting to discuss the

8   referenced corrective action and then agreed to extend the

9   plaintiff's leave to January 15, 2004, if necessary. Id. at

10  72-73.

11      Guenther did not receive a response from plaintiff until he

12  received her December 24, 2003 letter in which she accused

13  Guenther of retaliation and stated she could not subject herself

14  to "further hostile treatment" given her current medical

15  condition. Def.'s SUF at 75.  Guenther interpreted and accepted

16  this letter as her resignation and so advised her by letter

17  dated December 31, 2003. Id. at 76.  Guenther did not further

18  communicate with plaintiff.  He asserts that he believed that

19  any attempt to communicate would have been interpreted as

20  harassment. Id. at 77.  Plaintiff did not respond to Guenther's

21  December 31st letter. Id. at 78.

22      The plaintiff has not been employed in any capacity since

23  January 1, 2004. Def.'s SUF at 9.  Plaintiff has received state

24  disability benefits from March of 2003 until March/April of 2004

25  and Social Security benefits from March/April 2004 through the

26  present. Id. at 12.

1          **IV.**

2          **ANALYSIS**

3  **A.    FAILURE TO ACCOMMODATE**

4          Plaintiff contends that the defendant violated the ADA and

5  FEHA when it continuously failed to provide a reasonable work

6  accommodation during and following her treatment of breast

7  cancer.  She alleges that the violations occurred on numerous

8  occasions over the course of her employment, culminating in her

9  constructive discharge.  Below, I examine her contentions in the

10 order presented by her.

11         The ADA prohibits employers from discriminating against a

12 qualified individual with a disability based on that disability.

13 Such discrimination includes "not making reasonable

14 accommodations to the known physical or mental limitations of an

15 otherwise qualified individual[,] . . . unless the covered

16 entity can demonstrate that the accommodation would impose an

17 undue hardship." 42 U.S.C. § 12112(b)(5)(A).[2]  A "qualified

18 individual with a disability" is "an individual with a

19 disability who, with or without reasonable accommodation, can

20 perform the essential functions of the employment position that

21 such individual holds or desires." 42 U.S.C. § 12111(8).

22

23         [2]  Because the FEHA provisions relating to disability
   discrimination are based on the ADA, decisions interpreting the ADA
24 are relevant to interpreting the FEHA's similar provisions.  <u>See</u>
   <u>Brundage v. Hahn</u>, 57 Cal. App.4th 228, 235 (1997).  Accordingly,
25 I analyze plaintiff's state and federal disability claims together,
   relying on federal authority in the absence of contrary or
26 differing state law.

1      **1.**  **June, 2003**

2      Plaintiff contends that the defendant first failed to meet

3  its obligations under federal and state disability laws when she

4  returned to work after a four-month medical leave of absence

5  which she took after being diagnosed with breast cancer.  In

6  early June, 2003, plaintiff met with Noble and Conant to discuss

7  the termination of her medical leave and anticipated return date

8  of July 1, 2003.  Def's SUF 15.  Plaintiff contends, and

9  defendant disputes, that plaintiff requested additional leave

10  until the completion of her chemotherapy treatment. Depo. of

11  Lana Valente-Hook (Valente-Hook Depo.) at 35:22-36:14.  Whether

12  or not plaintiff made this request, it is undisputed that, in

13  discussing her return to work,  Conant "explained [to plaintiff]

14  that EPHC's medical leave of absence is 4 months [and that] [i]f

15  an employee is unable to return to work, [the] policy is that

16  the employee suffers a loss of benefits and is removed from the

17  payroll." Def's Exh. I to Br. in Supp. of Mot.  According to

18  Conant, a removal from payroll meant that plaintiff would cease

19  to be a hospital employee.  Depo. of Cathy Conant (Conant Depo.)

20  at 29:16-19.

21      As plaintiff contends, defendant unlawfully failed to

22  provide a reasonable accommodation when it flatly refused to

23  provide additional leave, since, according to the employer's

24  policy, and as Conant admits, a personal leave of absence was a

25  viable option. Conant Depo. at 85:3-86:9.  Although it is

26  disputed whether plaintiff informed Conant and Noble that she

1  was precluded from returning to work during her chemotherapy, it
2  is undisputed that Conant was aware that plaintiff was
3  undergoing chemotherapy at time. Conant Depo. at 31:17-25.
4  Accordingly, even if plaintiff had not specifically requested
5  additional leave, defendant may still be found liable for not
6  raising and exploring that possible accommodation on its own.
7  As the Ninth Circuit has explained, because "[e]mployees do not
8  have at their disposal the extensive information concerning
9  possible alternative positions or possible accommodations which
10 employers have," employers may not place the entire burden on
11 the employee to identify a reasonable accommodation since "they
12 do not have the superior knowledge of the workplace that the
13 employer has." Barnett v. U.S. Air, 228 F.3d 1105, 1113 (9th
14 Cir. 2000).

15     Defendant defends its failure to explore personal leave on
16 the grounds that it "was not legally required" to grant
17 plaintiff a personal leave "while she completed her
18 chemotherapy." Def's Br. in Supp. of Mot. at 11.  Defendant is
19 mistaken.  The Ninth Circuit has explicitly stated that "[a]
20 leave of absence for medical treatment may be a reasonable
21 accommodation under the ADA." Humphrey v. Memorial Hospitals
22 Ass'n., 239 F.3d 1128, 1135 (9th Cir. 2001)(citing 29 C.F.R.
23 1630 app. § 1630.2(o)).  Here, despite defendant's erroneous
24 understanding of its legal obligation, it was required to grant
25 plaintiff a personal leave of absence because it "would [have]
26 reasonably accommodate[d] [plaintiff's] disability and

1  permit[ted] [her], upon [her] return, to perform the essential

2  functions of the job." Id. at 1135-36.  Further, defendant

3  nowhere argues such an accommodation would have imposed a

4  hardship.  Instead, the evidence clearly shows that defendant

5  simply did not consider a personal leave of absence.

6      Defendant maintains that, despite its failure to provide a

7  personal leave, it provided other reasonable accommodations when

8  it considered a modified work schedule.  According to defendant,

9  Noble and Conant discussed creating a desk "chart audit

10 position" as a possible accommodation after plaintiff indicated

11 that she was incapable of performing her regular nursing duties

12 upon her return to work. Def's SUF 19, 20.  This attempt to

13 accommodate plaintiff's disability, however, proved fruitless,

14 as Guenther disapproved of the position and it was never offered

15 to plaintiff. Conant Depo. at 34:4-35:18.

16     In the alternative, defendant asserts that the law does not

17 require employers to create a new position as an accommodation

18 or to reassign an employee to another position unless it is

19 vacant. See Watkins v. Ameripride Serv., 375 F.3d 821, 829 (9th

20 Cir. 2004).  Although defendant is correct in that assertion, it

21 had an affirmative duty to explore other possible

22 accommodations, which it did not do.

23     Lastly, defendant argues that, regardless of any flaws in

24 its actions during June, 2003, it cannot be held liable under

25 the ADA or FEHA because it ultimately granted plaintiff's

26 request to work part-time upon her return on July 1, 2003.

15

1  Again, however, defendant's efforts fall short of that required
2  by the ADA and FEHA.

3      On June 12, 2203, plaintiff submitted a doctor's release,
4  as required to prevent her from being removed from payroll.  The
5  release indicated that plaintiff could return to full nursing
6  duty for two days a week with 12 hour shifts. Def's SUF 23.  As
7  defendant asserts, plaintiff was allowed to return to work on
8  that schedule.  While, at first glance, it may appear that this
9  action satisfied the ADA, placed in context, the accommodation
10  was not reasonable or "effective[] in enabling [plaintiff] to
11  perform the duties of the position." Barnett, 228 F.3d at 1115.
12  During the June, 2003 meeting, defendant gave plaintiff two
13  options: (1) lose her benefits and be removed from payroll if
14  she could not return to work starting July 1, 2003, or (2)
15  provide proof that she was able to return to work, in which case
16  she could continue her benefits and EPHC would attempt to
17  accommodate any limitations.  At that point, then, defendant had
18  already decided that it would not contemplate any accommodations
19  whatsoever if plaintiff could not return to work as of July 1st.
20  Defendant's purported accommodation was effectively a Hobson's
21  choice.  As plaintiff explained during her deposition, even
22  though she felt that she could not return to work, she felt
23  forced into asking her doctor for the work release so that she
24  could maintain medical insurance to pay for her $5,000 per
25  session chemotherapy.
26  ////

1   Further, the record contains evidence that could support a
2   finding that plaintiff's doctor would not have released her to
3   work, even part-time, if defendant had not foreclosed the
4   possibility of accommodating her inability to return to work on
5   July 1st.  Plaintiff's doctor wrote a letter in early August,
6   2003 stating that, when plaintiff first indicated she would have
7   to return to work no later than July 1, 2003, he "was not
8   comfortable with that," and that, when she again informed him
9   that she would lose her position and medical benefits if she did
10  not meet that requirement, he "reluctantly" "release[d] her to
11  her nursing duties part-time." Exh. 2 to Def's Br. in Supp. of
12  Mot.  Had defendant explored other accommodations in good faith,
13  it would have found that even a part-time schedule was not an
14  effective accommodation.  Because a jury could find that
15  defendant failed to provide a reasonable accommodation on the
16  grounds that it unilaterally limited the possibility of
17  accommodations when it required plaintiff to return to work,
18  summary judgment must be denied as to this claim.

19  **2.  August, 2003**

20  Defendant contends that it provided plaintiff with a
21  reasonable accommodation during August, 2003, when it granted
22  her a personal leave of absence from September of 2003 through
23  December 31, 2003. Def's SUF 57.  I examine this contention
24  below.
25  ////
26  ////

1   During August, 2003, the parties engaged in a series of
2   conversations and meetings regarding plaintiff's work status.
3   These communications were ineffective, however, in resolving
4   questions regarding plaintiff's working ability and
5   accommodations for her radiation treatments which were to begin
6   in September.  It is undisputed that it was not until plaintiff
7   obtained counsel that, through communications with defendant's
8   counsel, defendant granted plaintiff a discretionary personal
9   leave.  Defendant asserts that, although it did not provide the
10  leave "upon demand," it complied with its legal obligation when
11  it ultimately granted the personal leave.  Plaintiff does not
12  allege that defendant failed to accommodate her during this
13  period.  Rather, plaintiff points to these events to support her
14  claim for failure to engage in the interactive process.
15  Accordingly, the court determines that defendant provided
16  plaintiff with a reasonable accommodation during August of 2003.

17      **3.    <u>January, 2004</u>**

18  Plaintiff alleges that defendant again violated the ADA
19  and FEHA because it failed to reasonably accommodate her
20  disability when she sought to return to work at the end of her
21  personal leave.  In response, defendant argues that summary
22  judgment must be granted in its favor because an accommodation
23  was actually provided, but was rejected by plaintiff.  As I
24  explain below, there are material factual disputes which
25  preclude the court from granting summary judgment.
26  ////

1    Through a letter dated November 23, 2003, plaintiff

2    requested the following work accommodations upon her return to

3    EPHC on January 1, 2004: (1) "to have [her] full time status

4    changed to two 12-hour shifts per week as a regular employee of

5    the hospital," (2) "to be transferred to Loyalton Hospital,"

6    rather than returning to the Portola Hospital, (3) to maintain a

7    night-time shift, and (4) to work Thursday and Friday nights.

8    Def's Exh. M to Br. in Supp. of Mot. for Summ. J.  According to

9    plaintiff, these accommodations had been discussed with her

10   doctor in anticipation of her return date, Valente-Hook Depo. at

11   181:8-24, and were necessary to "reduce the stress on [her]

12   immune system and physical stamina," Def's Exh. M to Br. in

13   Supp. of Mot. for Summ. J.

14    Guenther responded by letter on November 25, 2003, stating

15   that EPHC was willing to allow plaintiff to work on a part-time

16   schedule, but that it was not, "for the time being," willing to

17   "accommodate [her] at the Loyalton campus or on the night

18   shift." Def's Exh. N.  Defendant contends that this offer

19   provided a reasonable and sufficient accommodation under the ADA

20   and FEHA because it was not obligated to provide plaintiff the

21   particular accommodation she requested.

22    While, as defendant points out, employers are not required

23   to grant the accommodations specifically requested by employees,

24   employers must nonetheless provide an *effective* accommodation to

25   "enable [plaintiff] to perform the duties of the position."

26   Barnett, 228 F.3d at 1115.  Here, the record contains evidence

19

1   upon which a trier of fact could find that the accommodation

2   proposed by Guenther was not reasonable and effective.  First,

3   Guenther failed to address plaintiff's concerns that requiring

4   her to work at the Portola Hospital would affect her stamina and

5   immune system, which would naturally affect her ability to

6   perform her nursing duties.  As early as August of 2003, EPHC

7   became aware that the 60-mile round trip commute to the Portola

8   hospital fatigued plaintiff so much that "by the time she [got]

9   off duty she [was]  . . . unable to drive home and ha[d] been

10  pulling off the road to sleep some and then continue home."

11  Def's Exh. G to Br. in Supp. of Mot. for Summ. J.  Through her

12  November 23rd letter, Guenther learned that the Loyalton hospital

13  was only four miles away from her home, which would greatly

14  reduce the stress of the commute.  Despite being on notice of

15  the difficulties the Portola commute placed on her ability to

16  fulfill her work duties, Guenther made no effort to verify with

17  her physician whether plaintiff's condition had improved so that

18  the commute would no longer create complications.  Second, only

19  several months prior to Guenther's November 25, 2003 decision,

20  plaintiff's doctor had informed EPHC that a day shift could

21  compromise plaintiff's immune system because of the "high

22  potential for infection" caused by high patient traffic. Def.

23  Exh. G to Br. in Supp. of Mot. for Summ. J.  Again, before

24  investigating whether, in her doctor's opinion, such a

25  limitation still existed, he unilaterally denied her request to

26  continue to work night shifts upon her return in January of

20

1    2004.

2        Defendant attempts to show that Guenther's decision was

3    only temporary and that his letter contemplated further

4    discussion regarding her accommodations.  The November 25th

5    letter states that, "[t]o facilitate this process and expedite

6    your return to work, I would suggest that . . . we have

7    correspondence from your treating physician as soon as possible"

8    "regarding your current medical condition." Id. at Exh. N.

9    These statements do not necessarily support defendant's

10   position, however, since a trier of fact could reasonably find

11   these statements to mean that plaintiff was required to submit a

12   release from her physician, as had been demanded of her in the

13   past.  Regardless, these statements do not by themselves

14   demonstrate that defendant provided a reasonable accommodation.[3]

15       Further, as plaintiff asserts, a trier of fact could also

16   find that defendant failed to provide a reasonable accommodation

17   when it failed to explore other possible assignments for her at

18   the Loyalton campus.  In response, defendant maintains that the

19   refusal to grant the transfer to Loyalton was based on

20   "legitimate business concerns."  According to Guenther, pursuant

21   to his inquiry, the Director of Nursing at the Loyalton

22

23       [3]  Defendant further defends Guenther's decision by stating
     that he "invited [plaintiff's] attorney's participation" to discuss
24   additional accommodations.  Br. in Supp. of Mot. for Summ. J. at
     12.  Defendant mischaracterizes Guenther's letter.  The letter
25   nowhere mentions future discussions regarding additional
     accommodations, but rather invites her attorney to join a
26   discussion regarding "appropriate corrective action" for her
     alleged misconduct during a meeting held on August 6, 2003.

1 facility, Tina Sloan, complained about plaintiff's work
2 performance, interpersonal relationships and level of training
3 and certification.  Def's SUF 63 & 66.  Based on Sloan's
4 opinion, Guenther determined that he should not grant
5 plaintiff's transfer.

6       Defendant apparently seeks to establish that plaintiff was
7 not qualified to work at Loyalton Hospital.  Guenther admits,
8 however, that he did nothing to independently verify plaintiff's
9 performance or qualifications while she was an employee at
10 Loyalton more than three years earlier.  Depo. of Charles R.
11 Guenther Depo.("Guenther Depo.") at 123:14-125:22.  Further,
12 defendant does not dispute that plaintiff's personnel file
13 contained work evaluations indicating that her performance met
14 or exceeded expectations. Exh. 24.  Other than allegedly relying
15 on Sloan's account, defendant nowhere claims that plaintiff
16 lacked the skills, training, or experience to work as a nurse at
17 either of its hospitals.  Therefore, Guenther's explanation
18 appears to be a mere pretext that cannot overcome plaintiff's
19 evidence that he failed to explore job positions at the Loyalton
20 hospital in good faith.

21       It is well settled that "[l]iability [under the ADA] is
22 appropriate if a reasonable accommodation without undue hardship
23 to the employer would otherwise have been possible." Humphrey,
24 239 F.3d at 1139.  Because, as explained above, a trier of fact
25 may find that EPHC failed to provide a reasonable accommodation
26 where one was possible, defendant's motion for summary judgment

22

1   on plaintiff's failure to accommodate claims must be denied.

2   **B.   FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS**

3        Defendant also seeks summary judgment on plaintiff's causes

4   of actions seeking to hold it liable for failing to engage in

5   the interactive process.  As I explain below, the defendant's

6   motion must also be denied as to these claims.

7        The ADA and the FEHA require that employers and employees

8   engage in a good-faith interactive process to explore a

9   reasonable accommodation.[4]  As the Ninth Circuit has explained:

> The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees . . . to identify an accommodation that allows the employee to perform the job effectively.  Both sides must communicate directly, exchange essential information, and neither side can delay or obstruct the process.

14  <u>Barnett</u>, 228 F.3d at 1114-1115.  In examining these types of

15  claims, the court must "attempt to isolate the cause of the

16  breakdown [in the interactive process] and then assign

17  responsibility so that liability . . . ensues only where the

18  employer bears responsibility for the breakdown." <u>Id.</u> at 1114

19  (internal citation omitted).  "Employers who fail to engage in

20  the interactive process in good faith face liability for the

21  remedies imposed by the statute if a reasonable accommodation

22  would have been possible." <u>Humphrey</u>, 239 F.3d at 1137-1138.

23  ////

24  

25       [4]  The standard for FEHA violations for the failure to engage
    in the interactive process tracks the standard set for the ADA
26  violations in the Ninth Circuit.

1  **1.   June, 2003**

2      Plaintiff alleges that defendant failed to act in good

3  faith during the June, 2003 interactive process when it flatly

4  denied any possibility of accommodation unless she returned to

5  work on July 1, 2003 and when it did not explore modified

6  positions.  Defendant contends that it cannot be held liable for

7  its actions during June of 2003 because plaintiff was ultimately

8  accommodate when she was allowed a part-time schedule.  For the

9  reasons explained in part one of section A, _supra_, defendant's

10 contention has no merit and the motion must be denied.

11 **2.   August, 2003**

12     Defendant contends that it re-initiated the interactive

13 process in August of 2003 but that plaintiff twice acted in bad

14 faith and disrupted that process.  I examine this contention

15 below.

16     At the beginning of August, 2003, Noble received a schedule

17 change request from plaintiff to accommodate her college

18 schedule.  At the same time, Noble learned from plaintiff's co-

19 workers that she was having difficulty with her part-time

20 schedule and was experiencing major fatigue that affected her

21 ability to drive home after work.  Subsequently, Noble scheduled

22 to meet with plaintiff, Conant, and Maxine Flora, defendant's

23 then new Chief Nursing Officer, on Friday, August 8, 2003 to

24 discuss these issues.  Plaintiff asserts, and defendants

25 dispute, that Noble informed her that a purpose of the meeting

26 was to discuss whether plaintiff would return to work full-time

24

1  starting September 1, 2003.  Valente-Hook Depo. at 100:3-101:10.

2      On August 6, 2003, plaintiff went to Conant's office "to

3  seek counsel on how to handle" the scheduled meeting.  Valente-

4  Hook Depo. at 110:11-16.  She told Conant that she could not

5  come back to work full-time starting in September and that she

6  also "didn't want to handle the meeting inappropriately." Id. at

7  110:17-18.  After receiving a call from Conant, Flora joined the

8  plaintiff in Conant's office.  The record is somewhat unclear

9  about what transpired during this meeting.  Plaintiff asserts

10 that she was repeatedly told by both Conant and Flora that she

11 had exhausted all of her leave and had to return to work full-

12 time or that she would face being removed from pay-roll and

13 losing her medical benefits.  Valente-Hook Depo. at 116:21:133.

14 Defendant, on the other hand, contends that Flora and Conant

15 stressed that no decisions had been made regarding her work

16 status, that she would need a further medical evaluation, and

17 that a further discussion would be held during the August 8th

18 meeting.  The parties agree that the August 6th meeting became

19 heated and that plaintiff was emotional.  Defendant asserts, and

20 plaintiff denies, that she was hostile and used vulgar language

21 to Flora.  Defendant points to plaintiff's behavior during the

22 August 6th meeting as evidence of plaintiff's bad faith and full

23 responsibility for the breakdown of the interactive process.

24     The record, however, also contains evidence supporting

25 plaintiff's position that it was defendant that demonstrated bad

26 faith during this meeting when Conant and Flora repeated that

there was no option or possible accommodation available other than for plaintiff to return to work full-time starting September 1, 2003.  Plaintiff avers that the defendant's unwillingness to consider other accommodations during her weakened physical and mental state caused her emotional breakdown during that meeting.  According to plaintiff, then, it was the defendant's behavior during this meeting that interrupted the interactive process.

The record contains evidence allowing a jury to find that defendant acted in bad faith during the August 6th meeting. Conant admits that she explained to plaintiff that she "ha[d] exhausted her extended disability benefits, medical leave and FMLA leave options" and that "if she could not work, she would be entitled to SDI [State Disability Insurance]." Def's Exh. J. Flora stated that she and Conant "expressed repeatedly that [they] had no intention of forcing her to return to work," but explained to her that defendant was having "difficulty . . . accommodating her currently and that she was to return to full time by September 1, 2003." Depo. Exh. 6; Flora Depo. at 49:2-51:3.  Based upon these statements, a jury could reasonably find that defendant simply gave plaintiff more of the same when Conant and Flora indicated that there was no possibility for accommodations unless she returned to work.

Defendant also insists that the court should find that plaintiff was responsible for the breakdown of the interactive process because she chose not to attend the scheduled August 8th

26

meeting.  According to plaintiff, however, she indicated to
Conant and Flora on August 6th that she would not be at the
August 8th meeting and that she would be seeking a lawyer.
Valente-Hook Depo. at 132:20-24.  Further, although she did not
attend the August 8th meeting, she continued to participate in
the interactive process when, on August 8th, she delivered to
Conant a letter from Dr. Reddy describing her medical condition.

Defendant insists that the breakdown was plaintiff's fault
by pointing to another incident that occurred on August 8th.  On
that day, plaintiff attempted to retrieve her paycheck, but she
was told that Flora was holding her check and that plaintiff
would need to get it from her.  The parties agree that plaintiff
indicated to Flora that she did not want to speak with her and
wished only to collect her paycheck.  Valente-Hook Depo. at 148.
Flora insisted, however, that plaintiff first speak with her to
discuss a memorandum regarding plaintiff's need to receive an
medical examination for duty fitness.  During this encounter,
plaintiff began yelling, which caused Conant to call security.
According to defendant, plaintiff's behavior on this day
demonstrates her bad faith in the interactive process.

Although the extent of plaintiff's behavior during the
August meetings is disputed, it is undisputed that plaintiff did
become emotional and yelled at Conant and Flora during these
meetings.  The question, then, necessarily becomes whether
plaintiff's behavior discharged defendant's obligation to
continue to engage in the interactive process in good faith.

27

1  The court cannot find, for purposes of this motion, that

2  plaintiff's behavior released defendant's obligation to engage

3  in the interactive process.  Plaintiff's behavior must be viewed

4  in light of her disability and the circumstances surrounding her

5  actions.  First, both Conant and Flora understood that

6  plaintiff's emotional state was delicate due to her medical

7  condition.  Conant attributed plaintiff's crying and emotional

8  behavior at the August 6th meeting to her "difficult illness."

9  Conant Depo. at 54:1-7.  Flora "believe[d] that she [was]

10  feeling some frustration with her current medical condition and

11  that [was] clouding her understanding of [defendant's]

12  position." Exh. 6.  Despite their awareness of plaintiff's

13  condition, Flora and Conant rejected plaintiff's concerns during

14  the August 6th meeting and insisted that she must work full-time

15  or face removal from payroll.  Further, Dr. Reddy's letter,

16  delivered to defendant on August 8th states that plaintiff was

17  "quite down in her emotional status" "due to her fatigue . . .

18  [and] the stress of her nursing position being questioned,"

19  which placed an "inappropriate stress level which triggers her

20  depression." Def's Exh. G.  Therefore, a trier of fact could

21  find that plaintiff did not act in bad faith, but that her

22  behavior was a result or component of her disability.

23      A trier of fact could also find that it was defendant that

24  acted in bad faith when Flora held her check and insisted on

25  speaking with plaintiff, despite the fact that Flora knew that

26  plaintiff was in a delicate emotional and physical state, and

1  had indicated she did not want to speak with Flora. Conant Depo.

2  at 55:4-6.

3      Plaintiff asserts that there are further material facts in

4  dispute upon which a jury could find that defendant failed to

5  engage in the interactive process in good faith.  For the

6  reasons explained below, I agree with plaintiff's contention.

7      By August 8, 2003, defendant was in possession of

8  plaintiff's physician's latest evaluation of her medical

9  condition.  In that letter, Dr. Reddy explains that, because

10  plaintiff "must have radiation treatment for 6 weeks, everyday,"

11  starting the first week of September, she would be placed on

12  full-time disability status. Def's Exh. G.  Therefore, defendant

13  understood that plaintiff could not return to work for six weeks

14  during her breast cancer treatment.  In response, Guenther wrote

15  on August 21, 2003, that "[g]iven that she is medically disabled

16  at this time and unable to return to work, her leave is deemed

17  to have expired.  This means that she will be suspended on our

18  payroll" and "she is no longer eligible to participate in the

19  employer sponsored health insurance plan." Def's Exh. H.

20  Although defendant had a personal leave policy which would have

21  allowed plaintiff to maintain her medical benefits, Guenther

22  testified that the reasons for rejecting a personal leave was

23  because plaintiff "refus[ed] to participate in the August 8th

24  meeting," Def's SUF at 53, and her "yet unresolved" conduct on

25  August 6th, Guenther Depo. at 99-101:6.  Based on this evidence,

26  a jury could find that Guenther's reasons for denying personal

1  leave were in bad faith.  Accordingly, defendant's motion must

2  be denied.

3      **3.   November, 2003**

4      Similarly, the court determines that defendant failed to

5  engage in the interactive process when plaintiff requested

6  further accommodations in November 23, 2003.

7      The Ninth Circuit has explained that an "employer fails to

8  engage in the interactive process as a matter of law where it

9  rejects the employee's proposed accommodations by letter and

10  offers no practical alternatives." Barnett, 228 F.3d at 1116-17.

11  Here, as noted, Guenther flatly denied her transfer to Loyalton

12  Hospital as well as other requests even before obtaining a

13  medical evaluation, exploring other possible accommodations, or

14  initiating further discussions regarding other alternatives.

15  Thus, as in Barnett, defendant "denied [plaintiff's] request

16  without suggesting any alternative solutions, or exploring . . .

17  the possibility of other accommodations."

18      Similarly, providing an accommodation which defendant knew

19  that, by itself, had failed in the past, may have also been a

20  violation of its duty to engage in the interactive process in

21  good faith. Humphrey, 239 F.3d at 1138-1139 (Employer's legal

22  obligation to accommodate is a "continuing obligation" that is

23  triggered "where the employer is aware that the initial

24  accommodation is failing and further accommodation is needed.").

25  ////

26  ////

## C.    RETALIATION

Plaintiff also alleges that defendant unlawfully retaliated against her.  To survive a motion for summary judgment, plaintiff must first show (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two.  McAlindin v. County of San Diego, 192 F.3d 1226, 1238 (9th Cir. 1999).  "Thereafter, the burden of production shifts to the employer to present legitimate reasons for the adverse employment action.  Once the employer carries this burden, plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext.  Only then does the case proceed beyond the summary judgment stage. Id.[5]

Plaintiff alleges that defendant retaliated against her by denying reasonable accommodations, threatening to discipline her, and constructively discharging her in violation of the ADA and FEHA.  Defendant does not dispute that plaintiff engaged in protected activity when she requested accommodations and complained about defendant failing to meet its legal obligations; rather, it argues that plaintiff did not suffer an adverse employment action.

Plaintiff asserts that she suffered an adverse employment action because the terms and conditions of her employment were negatively affected when defendant denied her a personal leave

---

[5]  FEHA claims are analyzed under the same burden-shifting structure.

1  of absence or any other effective accommodation.  She also

2  contends that she suffered an adverse action when she was

3  allegedly constructively discharged from her job.  Given the

4  temporal relationship of the events in dispute, I cannot say

5  that a jury could not find on plaintiff's behalf.

6      Plaintiff also avers that defendant retaliated against her

7  in violation of public policy because she complained about the

8  "care, services, and conditions at EPDH."  Plaintiff does not

9  address these allegations in her opposition to defendant's

10 motion for summary judgment.  Because there is no apparent link

11 between the complaints plaintiff made regarding plaintiff's

12 hospital beds and any actions taken against her, defendant is

13 granted summary judgment as to her retaliation causes of action.

14 **D.   DISCRIMINATION BY WRONGFUL TERMINATION IN VIOLATION**

15 **OF THE FEHA**

16     Plaintiff also contends that she was constructively

17 discharged in violation of FEHA.[6]  See Gantt v. Sentry Ins., 1

18 Cal.App.4th 1083, 1095 (1992).  In order to prevail on her

19 wrongful termination claim, plaintiff must show that (1) EPHC

20 unlawfully discriminated against her on account of her

21 disability and that (2) she was forced to resign as a result

22 thereof. Perez v. Proctor and Gamble Mfg. Co., 161 F.Supp.2d

23 1110, 1124 (E.D. Cal. 2001).  As explained above, triable issues

24

25     [6] Defendant contends that plaintiff's discrimination claims
   are one and the same as her failure to accommodate claims.
   Plaintiff's complaint, however, is broad enough to be construed to
26 include FEHA discrimination claims based on unlawful termination.

32

1  of material fact exist as to the first prong.  Therefore, the

2  question the court must examine is whether plaintiff was

3  constructively discharged or whether she voluntarily resigned in

4  December of 2003.

5      "[C]onstructive discharge occurs when, looking at the

6  totality of the circumstances, a reasonable person in [the

7  employee's] position would have felt that he was forced to quit

8  because of intolerable and discriminatory working conditions."

9  Thomas v. Douglas, 877 F.2d 1428, 1434 (9th Cir.1989) (internal

10  quotations and citations omitted).  "The determination of

11  whether conditions were so intolerable and discriminatory as to

12  justify a reasonable employee's decision to resign is normally a

13  question of fact." Id.

14      Plaintiff contends that she was forced to resign in

15  December of 2003 due to EPHC's failure to offer her a reasonable

16  accommodation and to engage in the interactive process.

17  According to her, given defendant's continual refusal to explore

18  reasonable accommodations and to participate in the interactive

19  process, plaintiff concluded that EPHC was not going to

20  accommodate her disability to allow her to work, and that she

21  had no choice but to resign.  Because a reasonable juror could

22  conclude that plaintiff's belief was reasonable, there are

23  triable issues of fact that preclude summary judgment in

24  defendant's favor.

25  ////

26  ////

**E.   CAL. HEALTH & SAFETY CODE SECTION 1278.5 (WHISTLEBLOWING)**

The plaintiff also brings a discrimination and retaliation claim pursuant to section 1278.5 of the California Health and Safety Code.  Compl. at ¶ 68-70.

Section 1278.5 states that "[n]o health facility shall discriminate or retaliate in any manner against any . . . employee of the health facility because that . . . employee . . . has presented a grievance or complaint . . . relating to the care, services, or conditions of that facility." Cal. Health & Safety Code § 1278.5(b)(1).

According to plaintiff, in or about October 2002, she complained about the care and condition of EPHC when she voiced her concerns regarding the "absence of bed alarms for patients." Compl. at ¶ 8.  As a result of this complaint, the defendant allegedly retaliated and discriminated against her by refusing to accommodate her disability in the Spring of 2003. Id. at ¶ 70.

The defendant maintains that the record cannot support the plaintiff's claim because it is undisputed the plaintiff never reported her concerns to either Cathy Conant, the director of Human Resources, or to Charles Guenther, EPHC's CEO. Def.'s SUF at ¶ 81-82.  Without knowledge of the plaintiff's complaints, the defendant could not retaliate against the protected whistleblowing activity.  Plaintiff does not challenge defendant's contentions, but instead remains silent as to this cause of action.  Accordingly, plaintiff has not demonstrated

1  the existence of a factual dispute for this claim, and the court

2  must grant summary judgment for the defendant.

3  **F.   HARASSMENT**

4        Lastly, I address plaintiff's claim that the defendant

5  unlawfully harassed her because of her physical disability and

6  medical condition, in violation of the FEHA. Compl. at ¶ 46-49;

7  Pl.'s Br. in Oppo. to the Mot. for Summ. J. at 25.

8  Specifically, the plaintiff alleges the defendant violated

9  Cal. Gov't Code § 12940(j)(1), which provides, in relevant part,

10  that it is unlawful "[f]or an employer . . . because of . . .

11  physical disability, mental disability, medical condition . . .

12  to harass an employee . . . ."  Cal. Gov't Code § 12940(j)(1).

13        Under FEHA, harassment is actionable if "the defendant's

14  conduct would have interfered with a reasonable employee's work

15  performance and would have seriously affected the psychological

16  well-being of a reasonable employee and [the plaintiff] was

17  actually offended." Aguilar v. Avis Rent A Car System, Inc., 87

18  Cal.Rptr.2d 132, 139 (Cal. 1999) (plurality) (citing Fisher v.

19  San Pedro Peninsula Hosp., 262 Cal.Rptr. 842 (Cal. 1989)).

20  Unlike other forms of discrimination, harassment or "hostile

21  work environment" claims concern actions "outside the scope of

22  job duties which are not of a type necessary to business and

23  personnel management." Reno v. Baird, 76 Cal.Rptr.2d 499, 503

24  (Cal. 1998).  Personnel management actions commonly necessary to

25  carry out the duties of business and personnel management, and

26  thus outside the purview of harassment, include "'hiring and

firing, job or project assignments, office or work station

assignments, promotion or demotion, performance evaluations, the

provision of support, the assignment or nonassignment of

supervisory functions . . .,'" and decisions regarding meetings.

Reno, 76 Cal.Rptr.2d at 502 (quoting Janken v. GM Hughes

Electronics, 46 Cal.App.4th 55, 65 (Cal.Ct.App. 1996)).

The plaintiff points to several events over the course of

her employment with defendant to support her harassment claim.

She first alleges that Cathy Conant, Maxine Flora, and Charles

Guenther told her that she would be fired if she could not

return to work due to her medical condition. Pl.'s Br. at 25-26.

Second, EPHC unlawfully forced the plaintiff to return to work

under duress and caused her health to deteriorate. Id.  Third,

plaintiff was humiliated and intimidated when, in front of her

colleagues, Flora refused to release her paycheck unless they

discussed a fitness-for-duty test. Id.  Fourth, Guenther sent a

letter on December 31, 2003, stating that plaintiff was a

"dangerous" nurse, absent any investigation into that

allegation.  Id.  Finally, EPHC forced the plaintiff to resign

or risk further harm to her health. Id.

Plaintiff's cited evidence falls short of that required to

make a prima facie case of harassment, since the incidents she

complains of fall within the scope of job duties of a type

necessary to business and personnel management.  Although, as

explained above, defendant may have violated disability laws

when it refused to provide accommodations unless she returned to

work, for purposes of a harassment claim, those actions squarely fit within the scope of personnel management decisions regarding hiring and firing of employees.  Also, the decision to require plaintiff to return to work is inherently a decision concerning personnel management.  Making personnel decisions of this kind is fundamentally different from the type of conduct that constitutes harassment. See Reno, 76 Cal.Rptr.2d at 502 ("Harassment claims are based on a type of conduct that is avoidable and unnecessary for job performance.").  The incident concerning Flora's withholding of plaintiff's paycheck also fails to qualify as harassment.  Flora, as Chief Nursing Officer, acted in the supervisory capacity when she sought to discuss the plaintiff's employment situation.  Plaintiff nowhere alleges that Flora made any comment outside the scope of work duties.

Additionally, the plaintiff asserts that EPHC's December 31, 2003 letter also demonstrates harassment.  In that letter, Charles Guenther reiterated his refusal to assign the plaintiff to Loyalton Hospital, Exh. 13, justifying his decision in part based on plaintiff's former co-workers' opinion that plaintiff was a "dangerous" nurse. Id.  Regardless of Guenther's questionable tact and professional judgment, his statements in the letter merely provided a reason for his decision not to assign her another work site.

It is well established that the FEHA does not allow badgering of employees by employers, even within the sphere of

37

1  personnel management actions.  However, the law cannot be
2  stretched to cover more than the legislature intended, which in
3  this case is limited to protecting employees from harassment
4  arising from conduct beyond job duties which are not a type
5  necessary for business and personnel management. <u>Reno</u>, 76
6  Cal.Rptr.2d at 502.  The actions complained of by plaintiff do
7  not fall outside of that scope, accordingly, defendant's motion
8  for summary judgement will be granted as to this cause of
9  action.

10                              **IV.**

11                          **CONCLUSION**

12       Defendant's motion for summary judgment IS GRANTED in part
13  and DENIED in part as follows:

14       1.   DENIED as to failure to accommodate causes of actions,
15  except that the court grants summary adjudication as to the
16  failure to accommodate during August of 2003;

17       2.   DENIED as to the failure to engage in the interactive
18  process claims;

19       3.   GRANTED in part and DENIED part as to the unlawful
20  retaliation claims;

21       4.   DENIED as to the FEHA discrimination claim;

22       5.   GRANTED as to the Cal. Health & Safety Code § 1278.5
23  claim; and

24  ////

25  ////

26  ////

6.   GRANTED as to the FEHA Harassment claim.

IT IS SO ORDERED.

DATED:  April 28, 2005.

/s/Lawrence K. Karlton
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT